Paul T. Eidsness
Minnesota State Bar 67009
EIDSNESS LAW OFFICES, PLC
35 Interlachen Pl.
Minneapolis MN 55331
Paul@eidsnesslaw.com
T: (952) 473-1925
F: (952) 473-1926
*Attorney for Defendants*

Gregory J. Larson
Arizona State Bar 029641
LARSON & SIMPSON, PLC
90 S. Kyrene Rd., Ste. 5
Chandler, AZ 85226
T: (480) 426 – 0920
F: (800) 794 – 7044
Greg@LarsonandSimpson.com
*Attorney for Defendants*
*Pending Pro Hac Vice Admission*

# UNITED STATES DISTRICT COURT
# IN THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Starkey Laboratories, Inc., | Case No.: 0:18-cv-02669 JRT/TNL |
| Plaintiff, | **ANSWER TO COMPLAINT & COUNTER-CLAIM** |
| vs. | |
| Austin VanScoyk, an individual; and VCV Hearing Labs, LLC, an Arizona limited liability company, | |
| Defendants. | |
| Austin VanScoyk, an individual; and VCV Hearing Labs, LLC, an Arizona limited liability company; | |
| Counter-Claimant, | |

ANSWER TO COMPLAINT & COUNTER-CLAIM - 1

vs.

Starkey Laboratories, Inc., a Minnesota corporation,

                Counter-Defendant

Defendants Austin VanScoyk ("Mr. VanScoyk") and VCV Hearing Labs, LLC ("VCV") hereby answer Plaintiff Starkey Laboratories, Inc.'s ("Starkey") Complaint. Any allegation contained in the complaint that is not specifically admitted herein is denied.

**THE PARTIES**

1. Paragraph 1 is admitted.
2. Allegations in Paragraph 2 that Mr. VanScoyk is a resident or citizen of the State of Arizona are admitted, all other allegations in Paragraph 2 are denied.
3. Paragraph 3 is admitted.

**JURISDICTION AND VENUE**

4. Allegations in Paragraph 4 that Defendants transacted business in the state of Minnesota are admitted; all other allegations in Paragraph 4 are denied.
5. Allegations in Paragraph 5 that a court in Minnesota is the proper forum to resolve this dispute are admitted; all other allegations in Paragraph 5 are denied.

**FACTS**

6. Paragraph 6 is admitted.
7. Allegations in Paragraph 7 that VCV and Starkey entered into the contracts cited and that Mr. VanScoyk personally guaranteed the contracts are admitted, all other allegations in Paragraph 7 are denied.
8. Paragraph 8 is admitted.

ANSWER TO COMPLAINT & COUNTER-CLAIM - 2

9. Allegations in Paragraph 9 to the extent they accurately quote the Credit Guaranty are admitted; all other allegations in Paragraph 9 are denied.

10. Paragraph 10 is admitted.

11. Allegations in Paragraph 11 to the extent they accurately quote the Note Guaranty are admitted; all other allegations in Paragraph 11 are denied.

12. Paragraph 12 is admitted.

13. Allegations in Paragraph 13 to the extent they accurately quote the Security Agreement are admitted; all other allegations in Paragraph 13 are denied.

14. Paragraph 14 is admitted.

15. Allegations in Paragraph 15 to the extent they accurately quote the Amended Note Guaranty are admitted; all other allegations in Paragraph 15 are denied.

16. Allegations in Paragraph 16 that Starkey sold products to VCV on credit are admitted; all other allegations in Paragraph 16 are denied.

17. Allegations in Paragraph 17 that VCV has ceased operations are admitted; all other allegations in Paragraph 17 are denied.

18. Paragraph 18 is denied.

19. Paragraph 19 is denied.

20. Paragraph 20 is denied.

21. Paragraph 21 is denied.

22. Paragraph 22 is denied.

23. Paragraph 23 is denied.

24. Paragraph 24 is denied.

## CLAIM FOR RELIEF

## COUNT I

### -Breach of Contract-

25. Defendants incorporate all prior allegations in response to Paragraph 25.

26. Paragraph 26 is denied.

27. Paragraph 27 is denied.

28. Paragraph 28 is denied.

29. Paragraph 29 is denied.

## AFFIRMATIVE DEFENSES

30. Defendants assert the following affirmative defenses:
    a. Setoff;
    b. Breach of contract;
    c. Breach of covenant of good faith and fair dealing;
    d. Release;
    e. Settlement;
    f. Duress;
    g. Waiver.

## PRAYER FOR RELIEF

THEREFORE, having fully answered Plaintiff's Complaint, Defendants pray for the following relief:
   a. Judgment in favor of Defendants with Plaintiff taking nothing;
   b. Dismissal of Plaintiff's Complaint;
   c. All other relief that is just and appropriate under the circumstances.

## COUNTERCLAIM

Counter-Claimants, Austin VanScoyk ("Mr. VanScoyk"), and VCV Hearing Labs, LLC ("VCV") hereby allege and say as follows:

## PARTIES, JURISDICTION, VENUE

1. VCV is a limited liability company existing under the laws of Arizona, with its principal place of business in the state of Arizona.
2. Austin VanScoyk, a married man, is a resident and citizen of the state of Arizona.

ANSWER TO COMPLAINT & COUNTER-CLAIM - 4

3. Mr. VanScoyk's spouse is not a party to any agreement or contract entered into with Starkey.

4. Starkey Laboratories, Inc. ("Starkey") is a Minnesota corporation with its principal place of business in the state of Minnesota.

5. VCV and Starkey entered into agreements subject to Minnesota law.

6. The amount in controversy in this case is more than $75,000.

7. Counter-Claimants and Counter-Defendant are of completely diverse citizenship.

8. This Court has diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

9. Venue is proper in the Minnesota United States District Court under 28 U.S.C. § 1391.

## FACTS

### VCV, Mr. VanScoyk, Starkey, and the Better Sounding Network

10. Mr. VanScoyk began VCV Hearing Labs LLC by purchasing Zounds franchise locations in Arizona and Florida in the year 2013.

11. Zounds is a hearing aid manufacturer based in Arizona.

12. Mr. VanScoyk had a partner in VCV Hearing Labs LLC.

13. In 2016, Mr. VanScoyk and his partner decided they wanted to sell VCV.

14. Zounds and Widex each considered either purchasing or investing in VCV and valued VCV at $8 million.

15. Widex is a hearing aid manufacturer in Denmark.

16. In January 2017, Mr. VanScoyk contacted Starkey to negotiate a Starkey investment in VCV.

17. Shortly thereafter, Starkey began courting VCV and Mr. VanScoyk to become Starkey product distributors.

18. Before VCV could become a Starkey product distributor, it became necessary for VCV to pay off its franchise agreement obligations to Zounds, and buy out Mr. VanScoyk's partner's interest in VCV.

19. In April 2017, Starkey provided $4,328,916.00 (the "Promissory Note") to VCV so VCV could buy out its partner and pay off obligations under the Zounds franchise agreements.

20. At the same time, Starkey and VCV entered into a Starkey Hearing Alliance Agreement ("SHA Agreement") whereby Starkey agreed to provide hearing aids on credit to VCV.

21. Under the Promissory Note, VCV would repay Starkey by selling Starkey's products over 10 years.

22. To induce VCV into selling Starkey products, Starkey gifted 100 hearing aids at a value of about $100 each to VCV.

23. Ultimately, VCV returned many of the gifted hearing aids to Starkey.

24. Starkey and VCV entered into various other agreements in addition to the SHA Agreement.

25. VCV's principal, Austin VanScoyk ("Mr. VanScoyk") negotiated the agreements between Starkey and VCV.

26. On June 7, 2017, VCV and Starkey amended the Promissory Note to increase the principal amount to $4,419,894.00.

27. Through his work in the hearing aid industry, Mr. VanScoyk developed a network of hearing aid clinics across the country which were selling substantial amounts of hearing aids to end-consumers.

28. Starkey wanted to engage in a business relationship with VCV because VCV's network of hearing aid clinics and Mr. VanScoyk's influence on others in the industry was extensive and profitable.

29. Mr. VanScoyk had a valuable influence over other hearing aid clinics which Mr. VanScoyk did not own.

30. Mr. VanScoyk courted relationships between other hearing clinics and Starkey and started what became known as the "Better Sounding Network."

31. The Better Sounding Network included over 70 hearing aid clinics in Arizona, Florida, New Jersey, New York, South Carolina, North Carolina, Minnesota, Wisconsin, Georgia, Pennsylvania, Texas, Virginia, Michigan, Ohio, Missouri, Nebraska, Colorado, Louisiana, and West Virginia with 26 different clinic owners.

32. VCV paid off the Zounds franchise obligations for all members of the Better Sounding Network when they began their relationships with Zounds.

33. In exchange for assembling the Better Sounding Network and establishing the clinics' accounts to sell Starkey products, Starkey promised to pay Mr. VanScoyk a commission for each unit of Starkey product that clinics in the Better Sounding Network sold.

34. To implement Mr. VanScoyk's commission arrangement, Starkey hired Mr. VanScoyk as a W-2 "Sales Representative" employee.

35. Starkey was responsible to pay Mr. VanScoyk a commission of about $185 per unit of Starkey product that each clinic in the Better Sounding Network sold.

36. Starkey committed to pay half of the commission quarterly, and would pay the remainder of the commission annually.

37. Starkey refused to pay all of Mr. VanScoyk's commissions.

**Starkey disassembled and took advantage of VCV**

38. VCV and the Better Sounding Network operated hearing aid clinics in the state of Florida.

39. Sales in Florida during the summer of 2017 were lackluster compared to projections.

40. In August and September of 2017, many residents of Florida fled the state because of the brutal 2017 hurricane season, including Hurricane Harvey and Hurricane Irma.

41. As a result of fewer residents and extensive hurricane damage, VCV's sales suffered.

ANSWER TO COMPLAINT & COUNTER-CLAIM - 7

42. In the wake of natural disaster, Starkey began making plans to take over the Better Sounding Network from VCV and demanded unrelenting performance in an unsustainable market.

43. However, VCV continued to operate and fervently attempted to recover.

44. During this same time, Starkey convinced Mr. VanScoyk to reveal business secrets to Starkey under the guise of offering help to recover economically.

45. Mr. VanScoyk revealed to Starkey the top performing sales people, the financial statements, the financial status, the business operations, and the marketing expenses of VCV.

46. Under the guise that it was consulting, Starkey convinced VCV to disclose VCV's most sensitive information and records to All American Hearing, Starkey's wholly owned retail hearing aid division.

47. Starkey convinced Mr. VanScoyk to engage in very expensive marketing contracts paid to Starkey's wholly owned marketing divisions which were unfruitful and squandered critical cash.

48. Starkey hired top sales people away from VCV to work directly for Starkey or for All American Hearing.

49. Starkey committed to Mr. VanScoyk on multiple occasions that it would offer financial and economic flexibility to VCV to keep it afloat during tough business times and praised Mr. VanScoyk for his tireless work to continue and recover business operations while clandestinely planning to take over VCV.

50. When Mr. VanScoyk requested financial flexibility in the relationship between VCV and Starkey, Starkey refused.

51. In early 2018, Starkey began informing VCV's personnel and members of the Better Sounding Network that VCV stopped paying its bills and was going out of business.

52. In February 2018, Starkey terminated VCV's account, preventing VCV from selling any more of Starkey's product, servicing VCV's patients, and handling

|   |     |                                                                                  |
|---|-----|----------------------------------------------------------------------------------|
| 1 |     | any warranty claims, which caused VCV's fragile customer base to become          |
| 2 |     | irate.                                                                           |
| 3 | 53. | Starkey convinced Mr. VanScoyk to provide all patient lists, marketing efforts,  |
| 4 |     | contact information, personnel information, office equipment, leases, landlord  |
| 5 |     | contact information, and unsold product to Starkey under the guise that this    |
| 6 |     | would satisfy any contractual obligation that either VCV or Mr. VanScoyk        |
| 7 |     | owed to Starkey.                                                                 |
| 8 | 54. | Starkey on multiple occasions affirmed to Mr. VanScoyk that it would not         |
| 9 |     | pursue Mr. VanScoyk for any debt allegedly owed in exchange for Mr.              |
| 10|     | VanScoyk handing over the VCV operations to Starkey.                             |
| 11| 55. | Realizing VCV had failed, Mr. VanScoyk began negotiating to terminate his        |
| 12|     | relations with Starkey.                                                          |
| 13| 56. | Starkey confirmed to Mr. VanScoyk that it would not pursue him because of        |
| 14|     | his compliance with Starkey's business windup requests.                          |
| 15| 57. | An implied term of the SHA Agreement includes the prohibition against            |
| 16|     | Starkey from interfering with VCV's business operations.                         |
| 17| 58. | This includes not stealing business.                                             |
| 18| 59. | This also includes not hiring key players away from VCV.                         |
| 19| 60. | Starkey slowly crept into VCV's operations by insisting on making personnel      |
| 20|     | decisions and influencing VCV into making poor business and financial            |
| 21|     | decisions.                                                                       |
| 22| 61. | Starkey admitted, through its executives, that its behavior was specifically     |
| 23|     | intended to precipitate the fall of VCV so that Starkey could take over the      |
| 24|     | Better Sounding Network and VCV's clinics at a steep discount and operate        |
| 25|     | them under Starkey's retail chain, All American Hearing.                         |
| 26| 62. | Starkey refused to pay Mr. VanScoyk the commissions he was due.                  |
| 27| 63. | Starkey proposed to help VCV by requesting sensitive financial and business      |
| 28|     | operation information.                                                           |

ANSWER TO COMPLAINT & COUNTER-CLAIM - 9

64. Starkey used the sensitive information it learned to further its own interests.
65. Starkey used VCV's sensitive information it learned to induce VCV's highest performing employees and sales people to quit working for VCV and go to work for Starkey.
66. Starkey used the sensitive information to disassemble VCV's network of hearing aid clinics for the purpose of devaluing VCV.
67. After Starkey caused the disassembly of VCV's network, it convinced Mr. VanScoyk to help it re-assemble the pieces in exchange for Starkey's aforementioned promise not to pursue Mr. VanScoyk for any alleged default of the Promissory Notes and SHA Agreement.
68. Mr. VanScoyk provided all information that Starkey requested and helped Starkey to assume operations of VCV.
69. Mr. VanScoyk maintained the integrity of VCV's records, which are valuable, and provided them directly to Starkey so Starkey could assume operation of VCV's hearing clinics through its retail stores, All American Hearing.
70. Mr. VanScoyk provided significant value to Starkey in the process of transferring VCV to Starkey and disassembling the Better Sounding Network.
71. This value includes but is not limited to phone lines, patient databases, marketing materials, financial statements, personnel, office equipment, office leases, business operation details and unsold Starkey product.
72. Neither Mr. VanScoyk nor VCV received any credit for the value they conferred to Starkey.

**COUNT I – BREACH OF CONTRACT**

73. VCV incorporates all prior allegations by this reference.
74. VCV and Starkey are parties to multiple contracts.
75. Starkey breached the terms of the contracts.
76. VCV suffered damages caused by Starkey's breach of the contracts in an amount to be determined at trial.

**COUNT II – BREACH OF DUTY OF GOOD FAITH & FAIR DEALING**

77. VCV incorporates all prior allegations by this reference.
78. Every contract entered into in Minnesota includes an implied duty of good faith and fair dealing.
79. Starkey breached the duty of good faith and fair dealing by preventing VCV from obtaining the benefit of its contracts.
80. VCV suffered damages caused by Starkey's breach of the duty of good faith and fair dealing in an amount to be determined at trial.

**COUNT III – UNPAID WAGES**

81. Mr. VanScoyk incorporates all prior allegations by this reference.
82. Mr. VanScoyk is an employee of Starkey.
83. Mr. VanScoyk is entitled to payment of commissions for his work for Starkey.
84. Mr. VanScoyk demanded that Starkey pay his commissions.
85. Starkey refused to pay Mr. VanScoyk his commissions.
86. Starkey is liable to Mr. VanScoyk for $225,000 in unpaid commissions.
87. Starkey is liable to Mr. VanScoyk for statutory damages under M.S.A. § 181.13.
88. Starkey is liable for Attorneys' fees and costs under M.S.A. § 181.171.
89. Starkey is liable to Mr. VanScoyk for compensatory damages and other relief under M.S.A. § 181.171 in an amount to be proven at trial.

**COUNT IV – DECLARATORY JUDGMENT**

90. Mr. VanScoyk and VCV incorporate all prior allegations by this reference.
91. A justiciable controversy exists concerning breach of the contracts between the parties, enforceability of the Promissory Notes, and whether Mr. VanScoyk is entitled to recover unpaid commissions.
92. Declaratory judgment would terminate the controversy between the parties.
93. Counter-Claimants request a speedy hearing as contemplated under F.R.C.P. 57.

**COUNT V – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

94. VCV incorporates all prior allegations by this reference.
95. Starkey induced or otherwise caused third persons not to enter into or continue their prospective relations with VCV, and prevented others from acquiring or continuing prospective relations with VCV.
96. Starkey prevented VCV from selling its hearing aid clinics to Zounds or Widex.
97. Starkey hired key performing sales people away from VCV for the purpose of crippling VCV's sales for the benefit of Starkey.
98. Starkey misappropriated valuable data from VCV for the purpose of crippling VCV for the benefit of Starkey.
99. Starkey's interference with economic advantage caused damages to VCV in an amount to be proven at trial.

**DEMAND FOR JURY TRIAL**

100. Counter-Claimants demand trial by jury.

**PRAYER FOR RELIEF**

THEREFORE, Counter-Claimants pray for the following relief:

a. Speedy hearing under FRCP 57;
b. Declaratory judgment;
c. Actual damages;
d. Consequential damages;
e. Statutory damages;
f. Special damages of $225,000;
g. Attorneys' fees;
h. Costs;
i. All other relief the Court deems appropriate under the circumstances.

RESPECTFULLY SUBMITTED this 17th day of September, 2018.

                                    EIDSNESS LAW OFFICES, PLC

                                    */s/ Paul T. Eidsness*
                                    Paul T. Eidsness
                                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

HENSON & EFRON, P.A.
David Bradley Olsen
Eric M. Friske
220 S. 6th St., Ste. 1800
Minneapolis MN 55402
(612) 339-2500
DOlsen@hensonefrom.com
CFisher@hensonefron.com
JBostrom@hensonefron.com
EFriske@hensonefron.com
*Attorneys for Plaintiff*

                                    EIDSNESS LAW OFFICES, PLC

                                    */s/ Paul T. Eidsness*
                                    Paul T. Eidsness
                                    *Attorney for Defendants*